# EXHIBIT 4

**COHEN MILSTEIN SELLERS & TOLL PLLC**
MICHAEL B. EISENKRAFT (ME6974)
meisenkraft@cohenmilstein.com
88 Pine Street
14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

*Additional Plaintiffs' Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
## BROOKLYN DIVISION

|  |  |
|---|---|
| **THOMAS ALLEGRA, YESENIA ARIZA, MARIANA ELISE EMMERT, STUART ROGOFF, GRACELYNN TENAGLIA,** and **MELISSA VERRASTRO** individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**LUXOTTICA RETAIL NORTH AMERICA**, an Ohio corporation d/b/a LensCrafters,<br><br>Defendant. | <u>**CLASS ACTION**</u><br><br>**SECOND AMENDED CONSOLIDATED COMPLAINT**<br><br>CASE NO. 1:17-cv-05216-PKC-RLM |

## CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Thomas Allegra, Yesenia Ariza, Mariana Elise Emmert, Stuart Rogoff,

Gracelynn Tenaglia, and Melissa Verrastro, individually, and on behalf of all others similarly

situated, hereby file suit against the Defendant listed above and allege the following:

## INTRODUCTION

1.      Plaintiffs and class members purchased prescription eyeglasses from LensCrafters

after being measured using the AccuFit® Digital Measurement System ("AccuFit") offered at

LensCrafters.  LensCrafters touts its AccuFit system as providing uniquely accurate

measurements of the pupillary distance ("PD")[1] between the customer's eyes to locate the optical

centers of the eyeglass lenses. LensCrafters advertises that its AccuFit system "measures your

eyes five times more precisely than traditional methods, down to a tenth of a millimeter" –

roughly the width of a human hair.[2]  LensCrafters claims that this allows the company to

manufacture prescription eyeglasses "which provides a lens fit with five times greater precision

than traditional methods."[3]  Thus, LensCrafters promises better prescription eyeglasses that

allow customers "to see your world more clearly," as "[y]our lenses are crafted based on exactly

how glasses sit on your face, where your eyes line up in the frame, and the distance between your

eyes—putting the prescription exactly where you need it to see your best."[4]

2.      However, LensCrafters cannot and does not deliver what it promises.  Even

---

[1] Pupillary distance ("PD") or interpupillary distance ("IPD") is the distance between the centers of the pupils in each eye.  The industry standard is to measure in millimeters. This measurement is used when manufacturing prescription eyeglasses.

[2] https://www.lenscrafters.com/lc-us/accufit (accessed August 28, 2017).

[3] http://www.luxottica.com/en/retail-brands/lenscrafters (accessed August 28, 2017).

[4] https://www.lenscrafters.com/lc-us/accufit (accessed August 28, 2017).

assuming its AccuFit system can provide PD measurements down to a tenth of a millimeter, when it manufactures prescription eyeglasses, LensCrafters uses decades-old technology that still involves manual measurements that must be rounded up to a full millimeter. Indeed, Lenscrafters' AccuFit system provides no more accuracy in manufacturing prescription eyeglasses than when measuring PD with a standard ruler.

3. This fact is known among LensCrafters' employees. When customers arrive at a LensCrafters store, employees are trained to push the AccuFit system as a selling point, telling customers that AccuFit ensures more accurate prescription eyeglasses and emphasizing to customers that they can only use AccuFit measurements at LensCrafters. When customers ask about the AccuFit system and whether it will really make their prescription eyeglasses more accurate, LensCrafters trains its employees to avoid answering the question, and to reiterate that AccuFit provides PD measurements that are "five times more accurate."

4. Because LensCrafters' manufacturing process uses the *same* decades-old traditional methods, the end-product sold to customers cannot and does not have PD measurements that are "five times" more accurate than traditional methods.

5. Customers are therefore induced to purchase prescription eyeglasses from LensCrafters when they otherwise would not have and/or overpay for prescription eyeglasses from LensCrafters based on false and misleading statements, and suffer damages.

**PARTIES**

6. Plaintiff Thomas Allegra is a citizen and resident of New York, over the age of eighteen years. Plaintiff purchased prescription eyeglasses, among other products and/or services, from LensCrafters after being measured by AccuFit in or about February 2016 for approximately $318 and in or about August 2016 for approximately $974.

3

7. Plaintiff Yesenia Ariza is a citizen and resident of New York, over the age of eighteen years. Plaintiff purchased prescription eyeglasses from LensCrafters after being measured by AccuFit in or about September 2016 for approximately $500. At the same time, Plaintiff Ariza purchased additional products and services from LensCrafters totaling approximately $50.

8. Mariana Elise Emmert is a citizen and resident of California, over the age of eighteen years. Plaintiff purchased prescription eyeglasses from LensCrafters after being measured by AccuFit in or about December 2017 for approximately $470.

9. Plaintiff Stuart Rogoff is a citizen and resident of California, over the age of eighteen years. Plaintiff purchased prescription lenses, among other products and/or services, from LensCrafters after being measured by AccuFit in or about February 2015 for approximately $1100.

10. Plaintiff Gracelynn Tenaglia is a citizen and resident of Florida, over the age of eighteen years. Plaintiff purchased prescription lenses, among other products and/or services, from LensCrafters after being measured by AccuFit in or about March 2015 for approximately $1100.

11. Plaintiff Melissa Verrastro is a citizen and resident of Florida, over the age of eighteen years. Plaintiff purchased prescription lenses, among other products and/or services, from LensCrafters after being measured by AccuFit in or about January 2016 for approximately $360 and in or about February 2017 for approximately $170.

12. Defendant Luxottica Retail North America d/b/a LensCrafters ("LensCrafters") is a citizen and resident of Ohio which regularly does business in New York and all over the United States. LensCrafters is headquartered at 4000 Luxottica Place, Mason, OH 45040.

4

## JURISDICTION AND VENUE

13.     This Court has jurisdiction for this case pursuant to 28 U.S.C. § 1332(d), as it is a class action for damages that exceed $5,000,000, exclusive of interest and costs.  Because named Plaintiffs are residents of New York, Florida, and California, members of the classes are residents of a state different from Defendant, who is incorporated and/or headquartered in Ohio.

14.     This Court has personal jurisdiction over Defendant because of its continuous and systematic business contacts with the State of New York, including the fact that LensCrafters maintains at least one corporate office in New York, has over 50 stores in New York, and derives substantial revenue from sales of its products in New York, with knowledge that its products are being marketed and sold for use in this State.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## FACTUAL ALLEGATIONS

**A.     The Eyeglass Industry and Manufacturing Process for Prescription Lenses**

16.     LensCrafters is a national eye care provider and prescription eyeglass manufacturer maintaining over 900 locations in the United States with optical labs on-site.[5]  The company was founded in 1983 and began to operate as a subsidiary of Luxottica Retail North America, Inc. in approximately 1995.  LensCrafters is one the largest companies in the $28 billion worldwide ophthalmic industry.[6]  In 2013, LensCrafters was estimated to serve more than

---

[5] http://www.cincinnati.com/story/money/2017/01/16/mason-based-lenscrafters-now-part-new-european-eyewear-giant/96633222/ (accessed August 28, 2017).
[6] https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/#1ebf22bb6b66 (accessed August 28, 2017).

four million customers each year and described itself as the "single most powerful player in the optical category . . ."[7]  Its sales exceeded $1.8 billion in 2013.[8]

17.     The process for fabricating prescription eyeglasses typically begins with lens "blanks," which are thick, clear blocks made of either glass or polymers.  After receiving a prescription order, a laboratory technician will select lens blanks that correspond to the prescription for each lens.

18.     A protective layer of adhesive tape is then applied to each lens blank to protect it from damage during the manufacturing process.

19.     The laboratory technician then attaches what is known as a "block" to the front of each lens blank.  Each lens, still attached to the block, is then placed in a machine called a blocker, which can be manual or digital.

20.     The blockers contain a heated metal alloy that melds each blocker to the front of each lens blank.  This process ensures that lenses are securely mounted and correctly positioned for the machining process (including surfacing, polishing and engraving).  The blocking process is critical because it is "not only the start, but also the cornerstone of the entire lens production process"[9] and, ultimately, the accuracy of a lens, "as the accuracy of the lens block directly influences the machining accuracy . . ."[10]

21.     After securing the lens blanks to the blocks, the laboratory technician locates and

---

[7] http://www.luxottica.com/sites/luxottica.com/files/2013_10_08_-_luxottica_investor_day_-_transcript.pdf (accessed August 28, 2017).
[8] *Id.*
[9] http://www.satisloh.com/fileadmin/contents/brochures/Ophthalmic/Blocking_and_deblocking/Blocking_Overview_2016_EN.pdf; https://www.google.ch/patents/US7946325?hl=de (accessed August 28, 2017).
[10] *Id.*

6

marks the optical center of each lens blank. The optical center is the point where vision is best in the lens and is centered over the customer's pupil.

22. Laboratory technicians use the customer's pupillary distance measurement(s) to locate the optical center of each lens.

23. After blocking, the lens blanks (still attached to the blocks) are attached to a lens generator and aligned. The lenses are ground until attaining the desired thickness and curves based on the individual's prescription.

24. The lenses are then placed in a surfacing machine to remove any marks left by the generator through a process called "fining" or "edging." When fining is complete, lenses are polished by another machine.

25. The technician then removes the lens block before conducting any final inspections or lens enhancements such as an anti-reflective enhancement or scratch resistance.

26. Finally, the lenses are placed in the frame and delivered to the customer.

**B.      LensCrafters and Its "AccuFit" System**

27. LensCrafters initially marketed itself as unique among prescription eyeglass manufacturers for its ability to manufacture glasses within one hour.[11] However, LensCrafters has not been able to fulfill its one-hour promise and has shifted its advertising away from that campaign.[12]

---

[11] https://www.lenscrafters.com/lc-us/about-lenscrafters?sid=OurVisionDD-LeftLink-AboutLC-US-112413 (accessed August 28, 2017).

[12] LensCrafters' website now states that "[i]n select locations, we may be able to make your glasses same-day or in about an hour. The ability to do so depends upon your particular prescription, the frame you choose, the lenses and options you select, and whether the store you visit has an onsite lab. If you are looking for same-day service, please let our store associates know so they can direct you toward options that they may be able to complete in house. To accommodate the many product enhancements that are now available, special processing is

28.     In or about 2009 and no later than 2011, LensCrafters introduced its AccuFit Digital Measurement System.[13]

29.     According to LensCrafters, AccuFit is "5 times more precise" than manual PD measurements and "measures the exact location of your pupils, the spacing of your eyes, and the shape of your glasses so [LensCrafters] can place your prescription in your lenses exactly where you need it to see your best."[14]

30.     The AccuFit system is a process that involves attaching a "fit sensor" to the frames selected by customers and using cameras and lasers to take measurements, including PD (the distance between the pupils).

31.     LensCrafters claims that the AccuFit system measures down to the tenth of a millimeter – which is roughly the width of a human hair – and that these measurements allow LensCrafters to manufacture prescription eyeglass that are far more accurate than prescription eyeglasses manufactured based on traditional PD measurements.  According to LensCrafters, its AccuFit technology "is fully integrated with [its] lens manufacturing system, so that [LensCrafters] can collect all the data and [it] can provide manufacturing of perfect customized lenses."[15]

32.     AccuFit became a central component of LensCrafters' marketing strategy. Indeed, through television commercials, online advertising, in-store marketing, and in-store

---

sometimes required.  These orders are typically processed within 7-14 business days." http://www.lenscrafters.com/lc-us/customer-service/faq (accessed August 28, 2017).
    [13] Confidential Witness 1, Former LensCrafters Licensed Laboratory Manager ("CW 1"); Confidential Witness 2, Former LensCrafters Licensed Laboratory Manager and Former General Manager ("CW 2.").
    [14] https://www.lenscrafters.com/AccuFit (accessed August 28, 2017).
    [15] http://www.luxottica.com/sites/luxottica/files/2013_10_08_-_luxottica_investor_day_-_transcript.pdf (accessed August 28, 2017).

employee sales pitches, AccuFit is touted as the differentiating feature for LensCrafters and the reason why customers should purchase their prescription eyeglasses from LensCrafters.

33.    For example, on its website, LensCrafters tells customers and potential customers that the difference between traditional measurements and its AccuFit system is "massive:"



[Text reads:  "WHY A TENTH OF A MILLIMETER IS MASSIVE" and "AccuFit® is our exclusive digital scanning system that measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter.  This means we can craft lenses more accurately and help you see the world more clearly."][16]

34.    LensCrafters' website goes on to state that:

**The old way will never
measure up.**

Goodbye rulers, hello super hi-tech future machines. The
LensCrafters AccuFit system replaces old-fashioned hand-held
measuring tools with a state-of-the-art digital system that is 5
times more precise.
. . .

AccuFit digitally measures the exact location of your pupils,
the spacing of your eyes, and the shape of your glasses so we
can place your prescription in your lenses exactly where you
need it to see your best.

---

[16] http://www.businesswire.com/news/home/20140130005961/en/LensCrafters-Takes-Stand-Quality-Vision-Care-Global (accessed August 28, 2017).

It's time to see what you're missing.[17]

35.     LensCrafters' parent company's corporate website states that the AccuFit system results in more accurate lenses:  "LensCrafters has made significant investments in technology including AccuFit Digital Measurement™, which provides a lens fit with five times greater precision than traditional methods."[18]

36.     LensCrafters makes similar representations in its filings with the Securities and Exchange Commission:  The "AccuFit Digital Measurement™ . . . provides a lens fit with five times greater precision than traditional methods . . ."[19]

37.     LensCrafters also touts its AccuFit system in its stores, prominently displaying advertisements for AccuFit, including its purported "5X" greater accuracy in measuring pupillary distance and its supposed benefits in making a customer's prescription eyeglasses more accurate:

---

[17] https://www.lenscrafters.com/AccuFit (accessed August 28, 2017).
[18] http://www.luxottica.com/en/retail-brands/lenscrafters) (accessed August 28, 2017).
[19] http://sec.edgar-online.com/luxottica-group-spa/20-f-annual-and-transition-report-foreign-private-issuer/2014/04/29/section6.aspx (accessed August 28, 2017).



38. This type of visual advertising is particularly important to LensCrafters' business model, as "[m]ost LensCrafters stores are located in high-traffic commercial malls and shopping centers."[21]

39. In addition, LensCrafters' store employees were instructed to push the AccuFit system by telling customers that its measurements were five times more accurate and that they should buy their prescription eyeglasses from LensCrafters because AccuFit would make their prescription eyeglasses more accurate.

40. Store employees understood the emphasis on AccuFit to be the result of LensCrafters' inability to manufacture prescription eyeglasses in one hour, its previous key sales pitch.[22]

---

[20] http://www.tuttleeye.com/files/2014/01/photo.jpg (accessed August 28, 2017).
[21] http://www.luxottica.com/en/retail-brands/lenscrafters (accessed August 28 2017).
[22] CW 1; CW 2.

41.     Contrary to LensCrafters' representations, however, the AccuFit system does not lead to more accurate prescription eyeglasses.

42.     Even assuming the AccuFit technology is, as advertised, five times more accurate than manual measurements,[23] LensCrafters cannot and does not translate the measurements taken from the AccuFit system into its manufacturing process.  Without the ability to translate supposedly more accurate measurements into the manufacturing process, LensCrafters' AccuFit system is no more effective in making prescription eyeglasses accurate than using a standard ruler to measure PD.

43.     Indeed, it was common knowledge among LensCrafters' employees that the AccuFit system provided no benefit in making prescription eyeglasses more accurate because LensCrafters' manufacturing equipment cannot measure beyond one millimeter, which is the same measuring capability as a standard ruler.[24]

44.     For example, Confidential Witness 1, a former LensCrafters Licensed Laboratory Manager, who worked at the company for approximately 16 years states that:  "Despite hyping the AccuFit measuring system and its more accurately crafted glasses, the LensCrafters stores never changed their equipment for manufacturing the glasses."  In 2011, this former Laboratory Manager asked the LensCrafters store's General Manager "when LensCrafters would update its laboratory equipment so that our glasses could be manufactured to one-tenth of a millimeter." He responded that "LensCrafters had no such plans."

45.     Rather than updating its laboratory equipment to more expensive, state-of-the-art

---

[23] This claim is dubious given the fact that skilled opticians use "their professional experience to evaluate your fitting needs based on many parameters that a machine cannot discern, such as your posture."  https://www.specsoptical.com/lab/ (accessed August 28, 2017).
[24] CW 1; CW 2.

machines that can use digital measurements, LensCrafters continued to use decades-old equipment that is only capable of making use of manual measurements.

46.     According to confidential witnesses, in particular, many of LensCrafters' laboratories, including its large, regional laboratories, use Coburn CS7 blockers, which were first sold in the 1970s and are no longer manufactured.  The Coburn CS7 blockers require the laboratory technician to lay out manually the lenses on a one-millimeter grid for the finished layout process.  This is the step used for the pupillary distance measurement.  Therefore, even if AccuFit provided a measurement of one-tenth of a millimeter, LensCrafters employees could not lay out the lenses to one-tenth of a millimeter.

47.     Even though AccuFit provides no benefit in the manufacturing of prescription eyeglasses, according to confidential witnesses, LensCrafters employees were instructed to use AccuFit as a selling point by touting its supposed accuracy in measuring pupillary distance, that it would make customers' prescription glasses more accurate, and that customers could only use the AccuFit measurements at LensCrafters.

48.     Further, according to confidential witnesses, LensCrafters also instructed employees to avoid discussing the manufacturing process when customers asked questions about AccuFit.  Instead, LensCrafters trained employees to keep emphasizing that AccuFit was "five times more accurate" in determining PD measurements.

49.     Notwithstanding these directives, LensCrafters knows that AccuFit provides no benefits and cannot be translated into the actual manufacturing process.  For example, according to confidential witnesses, frequently after showing a customer his or her AccuFit measurement, the LensCrafters associate doing the AccuFit measurement will simply round the result to a whole millimeter before sending the results to the laboratory.  And, even if the full tenth-of-a-

millimeter measurements are sent to the laboratory, a technician in the laboratory will round the number before placing the lenses on a blocker, because LensCrafters equipment can only measure to a whole millimeter.

50. LensCrafters employees know that laboratory equipment does not have the capability to craft eyeglasses with pupillary distance measurements that are accurate down to one-tenth of a millimeter, and that the use of the AccuFit measurement system is not beneficial. And, many of them are frustrated by the company's false and misleading statements regarding the AccuFit system. For example, during a training session conducted by Confidential Witness 1, a new laboratory technician observed that LensCrafters does not have laboratory equipment to craft lenses with pupillary distance measurements that are accurate down to one-tenth of a millimeter. The trainee reacted by saying, "so it's all a big lie."

51. On information and belief, everyone who purchased prescription eyeglasses from LensCrafters during the proposed Class Period (defined below) was measured using AccuFit.

### C. Plaintiffs' Experiences

#### a. *Thomas Allegra*

52. Plaintiff Thomas Allegra purchased prescription eyeglasses after being measured with AccuFit in Lake Grove, New York in or about February 2016 and in or about August 2016.

53. Prior to his purchase, Mr. Allegra received an email from LensCrafters regarding AccuFit. The email convinced Mr. Allegra to go to LensCrafters.

54. Upon entering the store, Mr. Allegra saw the "5X" signs by the front door and elsewhere in the store regarding AccuFit.

55. Mr. Allegra would not have purchased his prescription glasses from LensCrafters and/or would not have paid as much as he did had he known that its claims that AccuFit is "five

times more accurate" was not translated into the manufacture of his lenses.

### b. Yesenia Ariza

56.     Plaintiff Yesenia Ariza purchased prescription eyeglasses after being measured with AccuFit in New York, New York in or about September 2016.

57.     Prior to her purchase, Ms. Ariza heard about the AccuFit system based on a LenCrafters advertisement her grandmother had seen, which was a factor in her decision to shop at LensCrafters.

58.     Upon entering the store, Ms. Ariza saw the "5X" signs by the front door and elsewhere in the store regarding AccuFit.

59.     Ms. Ariza spoke with a LensCrafters employee who told her that the AccuFit "machine" was "better" and more precise than traditional methods.

60.     Ms. Ariza would not have purchased her prescription glasses from LensCrafters and/or would not have paid as much as she did had she known that its claims that AccuFit is "five times more accurate" was not translated into the manufacture of her lenses.

### c. Mariana Elise Emmert

61.     Plaintiff Mariana Elise Emmert purchased prescription eyeglasses after being measured with AccuFit in National City, California in or about December 2017.

62.     Prior to her purchase, Ms. Emmert was researching prescription eyeglass options and went to LensCrafters' website, where she saw an advertisement for AccuFit. The advertisement provided, *inter alia*, that AccuFit was five times more accurate. The representations on LensCrafters' website were a factor in Ms. Emmert deciding to shop at LensCrafters.

63.     Ms. Ariza would not have purchased her prescription glasses from LensCrafters

and/or would not have paid as much as she did had she known that its claims that AccuFit is "five times more accurate" was not translated into the manufacture of her lenses.

### e. Stuart Rogoff

64.     Plaintiff Stuart Rogoff purchased prescription glasses after being measured with AccuFit in Pleasanton, California in or about February 2015.

65.     Prior to his purchase, Mr. Rogoff saw advertisements about AccuFit, which were a factor in his decision to shop at LensCrafters.

66.     Mr. Rogoff would not have purchased his prescription glasses from LensCrafters and/or would not have paid as much as he did had he known that its claims that AccuFit is "five times more accurate" was not translated into the manufacture of his lenses.

### g. Gracelynn Tenaglia

67.     Plaintiff Graceylnn Tenaglia purchased prescription glasses after being measured with AccuFit in Jensen Beach, Florida in or about March 2017.

68.     Prior to her purchase, Ms. Tenaglia saw an advertisement about AccuFit and went to the LensCrafters website, where she learned more about AccuFit and its supposed precision. The advertisement and her review of the website were factors in her deciding to shop at LensCrafters.

69.     Upon entering the store, Ms. Tenaglia spoke with a LensCrafters employee who told her that AccuFit was "five times better" than traditional methods.

70.     Ms. Tenaglia would not have purchased her prescription glasses from LensCrafters and/or would not have paid as much as she did had she known that its claims that AccuFit is "five times more accurate" was not translated into the manufacture of her lenses.

### h. Melissa Verrastro

16

71.     Plaintiff Melissa Verrastro purchased prescription eyeglasses after being measured with AccuFit in Jensen Beach, Florida in or about January 2016, in or about February 2017, and in or about August 2014.

72.     Prior to her purchase, Ms. Verrastro saw a television ad regarding AccuFit, which was the reason she decided to shop at LensCrafters.  The ad referred to the improved accuracy provided by AccuFit.

73.     Upon entering the store, Ms. Verrastro saw the "5X" signs by the front door and elsewhere in the store regarding AccuFit.

74.     Ms. Verrastro would not have purchased her prescription glasses from LensCrafters and/or would not have paid as much as she did had she known that its claims that AccuFit is "five times more accurate" was not translated into the manufacture of her lenses.

## CLASS ALLEGATIONS

75.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 74.

76.     Pursuant to the Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiffs bring this action on behalf of themselves and the following Classes (collectively referred to as "the Class"):

> **The California Class** (represented by Plaintiffs Rogoff and Emmert).
>
> All residents of California who purchased prescription eyeglasses from LensCrafters from September 5, 2011 to present (the "California Class" and the "Class Period," respectively).
>
> **The Florida Class** (represented by Plaintiffs Tenaglia and Verrastro).
>
> All residents of Florida who purchased prescription eyeglasses from LensCrafters from September 5, 2011 to present (the "Florida Class" and the "Class Period," respectively).

**The New York Class** (represented by Plaintiffs Ariza and Allegra).

All residents of New York who purchased prescription eyeglasses from LensCrafters from September 5, 2011 to present (the "New York Class" and the "Class Period," respectively).

77.     Excluded from the Classes are the Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

78.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent ascertainable Classes, as determining inclusion in the class can be done through the Defendant's own records.

79.     Plaintiffs reserve the right to amend the Classes definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

80.     Although the precise number of members of the Classes is unknown and can only be determined through appropriate discovery, Plaintiffs believe, and on that basis allege, that the proposed Classes are so numerous that joinder of all members would be impracticable as Defendant has sold thousands of prescription eyeglasses measured using AccuFit in New York during the proposed Class Period.

81.     Questions of law and fact common to the Plaintiff Classes exist that predominate over questions affecting only individual members, including *inter alia*:

a.     Whether Defendant misrepresented material facts about its manufacturing

18

process, including the fact that AccuFit measurements could not be converted into the manufactured lenses;

b.       Whether Defendant omitted material facts about its manufacturing process, including the fact that AccuFit measurements could not be converted into the manufactured lenses;

c.       Whether Defendant engaged in deceptive acts or practices, including misrepresenting and/or omitting the fact that AccuFit measurements could not be converted into the manufactured lenses; and

d.       Whether Defendant falsely advertised its manufacturing process at the time of sale, including the fact that AccuFit measurements could not be converted into the manufactured lenses.

82.     Plaintiffs are members of the putative Classes. The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Classes, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

83.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Classes, as their interests coincide with, and are not antagonistic to, the other members of the Classes. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

84.     Certification of the Classes is appropriate pursuant to Fed. R. C. P. 23(b)(2) and (b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it

19

would be highly unlikely that the members of the Classes would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

85.     A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

86.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

## CAUSES OF ACTION

## COUNT I

**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *et seq.***
**(Asserted by Plaintiffs Emmert and Rogoff on behalf of the California Class)**

87.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

88.     By engaging in the acts and practices described above, Defendant committed one or more acts of "unfair competition" within the meaning of California Business & Professions Code § 17200.  "Unfair competition" is defined to include any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [Business & Professions Code §§ 17500, *et seq.*]"

89.     Throughout the Class Period, Defendant engaged in "unlawful" business acts and/or practices by, among other things, violating California Business & Professions Code §

17500.

90.     Throughout the Class Period, Defendant engaged in "unfair" business acts and/or practices by, among other things:

        a.      Engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiff and members of the Class;

        b.      Engaging in conduct that is immoral, oppressive, unscrupulous, or substantially injurious to Plaintiff and members of the Class; and

        c.      Engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint.

91.     Defendant committed unlawful, unfair, and/or fraudulent business acts or practices by, among other things, engaging in conduct Defendant knew or should have known was likely to and did deceive the public, including Plaintiffs and other members of the Class.

92.     As detailed above, Defendant's unlawful, unfair, and/or fraudulent practices include making false and/or misleading representations that its prescription eyeglasses were "five times more accurate."

93.     Defendant's unlawful, unfair, and/or fraudulent practices also include omitting the material information that its prescription eyeglasses were not "five times more accurate."

94.     Plaintiffs would not have purchased prescription eyeglasses from LensCrafters or would not have paid as much for them, but for Defendant's misleading statements about the prescription eyeglasses being "five times more accurate."

95.     Plaintiffs were injured in fact and lost money as a result of Defendant's conduct of improperly describing its prescription eyeglasses as "five times more accurate." Plaintiffs paid for a product that was "five times more accurate," but did not receive a product that was

"five times more accurate." Even assuming AccuFit's measurements were "five times more accurate," these measurements could not be converted into LensCrafters' manufacturing process, meaning the eyeglasses Plaintiffs purchased were not "five times more accurate."

96.     Plaintiffs and members of the Class seek restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, and other relief allowable under California Business & Professions Code § 17203, including, but not limited to, enjoining Defendant from continuing to engage in its unfair, unlawful, and/or fraudulent conduct as alleged.

## COUNT II

**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17500,** *et seq.*
**(Asserted by Plaintiffs Emmert and Rogoff on behalf of the California Class)**

97.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

98.     Throughout the Class Period, Defendant engaged in unlawful and/or fraudulent conduct under California Business & Professions Code § 17500, *et seq*. ("the False Advertising Law") by engaging in the sale of prescription eyeglasses, and disseminating to the public various advertisements that Defendant knew or reasonably should have known were untrue and misleading. Defendant committed such violations of the False Advertising Law with actual knowledge or knowledge fairly implied on the basis of objective circumstances.

99.     Defendant's advertisements and representations, as described herein, were designed to, and did, result in the purchase and use of the prescription eyeglasses. Defendant profited from its sales of these products to unwary consumers.

100.    Plaintiffs believed Defendant's representations that its prescription eyeglasses were "five times more accurate." Plaintiffs would not have purchased prescription eyeglasses

22

from LensCrafters and/or would not have paid as much for them had he known the prescription eyeglasses were not "five times more accurate."

101. Plaintiffs were injured in fact and lost money as a result of Defendant's conduct of improperly describing its prescription eyeglasses as "five times more accurate." Plaintiffs paid for prescription eyeglasses that were "five times more accurate," but did not receive such a product. The product Plaintiffs received was worth less than the product for which he paid.

102. Plaintiffs and members of the Class seek restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief enjoining Defendant from continuing to disseminate its untrue and misleading statements, and other relief allowable under California Business & Professions Code § 17535.

## COUNT III

**VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT,**
**Cal. Civ. Code § 1750, *et seq*.**
**(Asserted by Plaintiffs Emmert and Rogoff on behalf of the California Class)**

103. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

104. Defendant is a "person" within the meaning of California Civil Code §§ 1761(c) and 1770, and provides "goods" within the meaning of Civil Code §§ 1761(a) and 1770. Defendant's customers, including Plaintiffs and Class members, are "consumers" within the meaning of Civil Code §§ 1761(d) and 1770. Each purchase of Defendant's prescription eyeglasses by Plaintiffs and each Class member constitutes a "transaction" within the meaning of Civil Code §§ 1761(e) and 1770.

105. Each Class member purchased goods from Defendant that were primarily for personal, family, or household purposes.

106. The Consumer Legal Remedies Act ("CLRA") makes it unlawful for a company to, *inter alia*:

    a.    Misrepresent the certification of goods. Cal. Civ. Code § 1770(a)(2);

    b.    Represent that goods have characteristics or approval which they do not have. Cal. Civ. Code § 1770(a)(5);

    c.    Represent that goods are of a particular standard, quality, or grade, if they are of another. Cal. Civ. Code § 1770(a)(7);

    d.    Advertise goods with intent not to sell them as advertised. Cal. Civ. Code § 1770(a)(9).

    e.    Represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not. Cal. Civ. Code § 1770(a)(16).

107. Throughout the Class Period, Defendant violated and continues to violate the above-mentioned provisions by engaging in the actions, misrepresentations, and misconduct described herein.

108. Defendant violated the CLRA by representing through its advertisements its prescription eyeglasses as described above when it knew, or should have known, that the representations and advertisements were unsubstantiated, false, and misleading.

109. Plaintiffs believed Defendant's representations that its prescription eyeglasses were "five times more accurate." Plaintiffs would not have purchased prescription eyeglasses from LensCrafters and/or would not have paid as much for them, but for Defendant's misleading statements about its prescription glasses being "five times more accurate." Plaintiffs were injured in fact and lost money as a result of Defendant's conduct of improperly describing its prescription eyeglasses as "five times more accurate." Plaintiffs paid for a product that was "five

times more accurate" but did not receive a product that was "five times more accurate." Even assuming AccuFit's measurements were "five times more accurate," these measurements could not be converted into LensCrafters' manufacturing process, meaning the eyeglasses Plaintiffs purchased were not "five times more accurate."

110. On August 30, 2017, on behalf of a proposed class of California consumers and on behalf of the above-named representative of the California Class, Plaintiffs' counsel mailed to Defendant, by certified mail, return receipt requested, the written notice required by Civil Code § 1782(a). Defendant did not take the appropriate actions itemized in the notice within 30 days.

111. Pursuant to California Civil Code § 1780, Plaintiffs seek on behalf of himself and for all those similarly situated, compensatory and consequential damages, equitable and injunctive relief, punitive damages, costs and reasonable attorneys' fees and all other relief as appropriate.

## **COUNT IV**

### **VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT § 501.201, *et seq.*** **(Asserted by Plaintiffs Tenaglia and Verrastro on behalf of the Florida Class)**

112. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

113. Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") § 501.202(2) prohibits "unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

114. Throughout the Class Period, by advertising, marketing, distributing, and/or selling prescription eyeglasses with claims that they were "five times more accurate" to Plaintiff and other Class members, Defendant violated the FDUTPA by engaging in, and continuing to

engage in, false advertising concerning the accuracy of its prescription eyeglasses because its prescription eyeglasses are not in fact "five times more accurate."

115.    Additionally, throughout the Class Period, by failing to disclose that its prescription eyeglasses were not "five times more accurate" to Plaintiffs and other Class members, Defendant engaged in, and continues to engage in, deceptive acts and practices.

116.    Plaintiffs and other Class members seek to enjoin such unlawful acts and practices as described above.  Each of the Class members will be irreparably harmed unless the unlawful actions of Defendant are enjoined in that they will continue to be unable to rely on the Defendant's representations that its prescription eyeglasses are "five times more accurate" and its failure to disclose that its prescription eyeglasses are not in fact "five times more accurate."

117.    Plaintiffs were injured in fact and lost money as a result of Defendant's conduct of improperly describing its prescription eyeglasses as "five times more accurate."  Plaintiffs paid for "five times more accurate" prescription eyeglasses, but did not receive prescription eyeglasses that were "five times more accurate."  The product Plaintiffs received was worth less than the product for which she paid.

118.    Plaintiffs would not have purchased prescription eyeglasses from LensCrafters and/or would not have paid as much for them had she known the prescription eyeglasses were not "five times more accurate."

119.    Plaintiffs and Class members seek to enjoin Defendant from continuing to disseminate its false and misleading statements and continuing omissions, actual damages plus attorney's fees and court costs, and other relief allowable under the FDUTPA.

## COUNT V

**VIOLATION OF NY GENERAL BUS. LAW § 349,** *et seq.*
**(Asserted by Plaintiffs Allegra and Ariza on behalf of the New York Class)**

120.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

121.     N.Y. General Bus. L. § 349, *et seq.* ("GBL § 349") prohibits "deceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in [New York]."

122.     As fully alleged above, throughout the Class Period, by advertising, marketing, distributing, and/or selling prescription eyeglasses with claims that they were "five times more accurate" to Plaintiffs and other Class members, Defendant engaged in, and continues to engage in, deceptive acts and practices because its prescription eyeglasses are not in fact "five times more accurate."

123.     Additionally, throughout the Class Period, by failing to disclose that its prescription eyeglasses were not "five times more accurate" to Plaintiffs and other Class members, Defendant engaged in, and continues to engage in, deceptive acts and practices.

124.     Plaintiffs and other Class members seek to enjoin such unlawful, deceptive acts and practices as described above.  Each of the Class members will be irreparably harmed unless the unlawful, deceptive actions of Defendant are enjoined in that Defendant will continue to falsely and misleadingly advertise that its prescription eyeglasses are "five times more accurate" and fail to disclose that its prescription eyeglasses are not in fact "five times more accurate."

125.     Defendant's marketing and advertising of AccuFit was likely to mislead reasonable consumers acting reasonably under the circumstances.

126.     Defendant's omission of the material fact that its prescription eyeglasses were not

"five times more accurate" was likely to mislead reasonable consumers acting reasonably under the circumstances.

127.    Plaintiffs would not have purchased prescription eyeglasses from LensCrafters and/or would not have paid as much for them had they known the prescription eyeglasses were not "five times more accurate."

128.    Plaintiffs were injured in fact and lost money as a result of Defendant's conduct of improperly describing its prescription eyeglasses as "five times more accurate." Plaintiffs paid for "five times more accurate" prescription eyeglasses, but did not receive such products. The products Plaintiffs received were worth less than the products for which they paid.

129.    Plaintiffs and Class members seek restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under GBL § 349.

## COUNT VI

**VIOLATION OF NY GENERAL BUS. LAW § 350, *et seq.***
**(Asserted by Plaintiffs Allegra and Ariza on behalf of the New York Class)**

130.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

131.    N.Y. General Bus. L. § 350, *et seq.* ("GBL § 350") makes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York unlawful. GBL § 350 provides that "[i]n determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the

commodity . . . to which the advertising relates under the conditions prescription in said advertisement, but also any such conditions as are customary and usual."

132.    Throughout the Class Period, by advertising, marketing, and/or selling its prescription eyeglasses with claims that they were "five times more accurate" to Plaintiffs and other Class members, Defendant engaged in, and continues to engage in, false advertising concerning the accuracy of its prescription eyeglasses.

133.    Plaintiffs and other Class members seek to enjoin such false advertising as described above. Each of the Class members will be irreparably harmed unless the unlawful actions of Defendant are enjoined in that Plaintiffs will continue to be unable to rely on Defendant's representations regarding the accuracy of its prescription eyeglasses.

134.    Defendant's marketing and advertising of AccuFit was likely to mislead reasonable consumers acting reasonably under the circumstances.

135.    Plaintiffs would not have purchased prescription eyeglasses from LensCrafters and/or would not have paid as much for them had they known the prescription eyeglasses were not "five times more accurate."

136.    Plaintiffs were injured in fact and lost money as a result of Defendant's conduct of improperly describing its prescription eyeglasses as "five times more accurate." Plaintiffs paid for products that were "five times more accurate," but did not receive such products. The products Plaintiffs received were worth less than the products for which they paid.

137.    Plaintiffs and Class members seek restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under GBL § 350.

## COUNT VII

### QUASI-CONTRACT (UNJUST ENRICHMENT)
### (Asserted by All Plaintiffs Under Their Respective State Laws)

138.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

139.    Plaintiffs purchased prescription lenses from Defendant as a direct result of Defendant's misrepresentations about its ability to convert AccuFit measurement system results into eyeglasses that are "five times more accurate."

140.    Defendant generated profits from its misconduct.

141.    Defendant has knowingly and unjustly enriched itself at the expense and to the detriment of the Plaintiffs and each member of the Class by collecting money to which it is not entitled.

142.    It would be morally wrong to permit the Defendant to enrich itself at the expense of the Plaintiffs and the Class.  Defendant should be required to disgorge this unjust enrichment.

## COUNT VIII

### FRAUDULENT MISREPRESENTATION
### (Asserted by All Plaintiffs Under Their Respective State Laws)

143.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

144.    Defendant made representations about its prescription eyeglasses that were materially false and that Defendant knew were materially false.  These statements include, *inter alia*, that its prescription eyeglasses were "five times more accurate" because they were measured with the AccuFit® Digital Measurement System.  Defendant made these

representations in its advertising (online, in-store, and on television), through its employees, and on its website.

145.    Defendant's statements were made to induce Plaintiffs to rely on them, which Plaintiffs justifiably did.

146.    As a result of Defendant's fraud, Plaintiffs were induced to purchase the Defendants' lenses, or paid more than they would have, and thereby suffered injury.

## COUNT IX

### FRAUDULENT OMISSION
### (Asserted by All Plaintiffs Under Their Respective State Laws)

147.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 86.

148.    Defendant omitted material information that its prescription eyeglasses with an intent to defraud, knowledge of falsity, or a reckless disregard for the truth.  These omission include, *inter alia*, that its prescription eyeglasses were "five times more accurate" because they were measured with the AccuFit® Digital Measurement System.  Defendant's material omission occurred in its advertising (online, in-store, and on television), through its employees, and on its website.

149.    Defendant's omissions of material information were intended to induce Plaintiffs to rely on incorrect information, which Plaintiffs justifiably did.

150.    As a result of Defendant's fraud, Plaintiffs were induced to purchase the Defendants' lenses, or paid more than they would have, and thereby suffered injury.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request judgment against the Defendant for themselves and the members of the class as follows:

31

      A.     Certification of the requested Classes pursuant to Fed. R. Civ. P. 23(b)(2) or (b)(3);

      B.     Restitution of all charges paid by Plaintiffs and the Class;

      C.     Disgorgement to Plaintiffs and the Class of all monies wrongfully obtained and retained by Defendant;

      D.     Compensatory and actual damages in an amount according to proof at trial;

      E.     Statutory damages, penalties, treble damages, as provided by law;

      F.     Prejudgment interest commencing on the date of payment of the charges and continuing through the date of entry of judgment in this action;

      G.     Costs and fees incurred in connection with this action, including attorney's fees, expert witness fees, and other costs as provided by law;

      H.     Punitive damages;

      I.     Equitable relief;

      J.     Injunctive relief; and

      K.     Granting such other relief as the Court deems proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby request a jury trial for all issues so triable of right.

DATED this 21st day of September, 2018.

Respectfully submitted,

*s/  Michael B. Eisenkraft*
_____

Michael B. Eisenkraft (ME6974)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street
14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
Facsimile:   (212) 838-7745

Theodore J. Leopold (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL  33410
Telephone:  (561) 515-1400
Facsimile:   (561) 515-1401

Andrew N. Friedman (admitted *pro hac* vice)
Geoffrey A. Graber (admitted *pro hac vice*)
Sally M. Handmaker (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699

Steve Calamusa, Esq. (admitted *pro hac vice*)
**GORDON & DONER**
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050

*Attorneys for Plaintiffs*